*Leta Tsosie WILLIAMS*
Plaintiff
*vs.*
*PEABODY WESTERN COAL COMPANY*
Defendant

Fanny Leonard and Marion Begay,
Real Parties in Interest.

In the District Court of the Navajo Nation
Judicial District of Kayenta, Arizona

No. KY-CV-136-03

August 11, 2005

## INTERIM JUDGMENT

The Court has subject matter jurisdiction as set forth in an order signed on June 16, 2004, and it has personal jurisdiction over the parties in this case.

On Nov. 19, 1974, an agreement among Black Mesa residents, The Peabody Coal Company (hereinafter, "Peabody") and the Navajo Nation was established to pay compensation for disturbance of land caused by mining operations on Black Mesa. Peabody Exhibit 1. This agreement was to cover disturbance to land from before 1974 though 1977. *Id.* A second agreement was established in 1978 to continue the compensation, although at a rate of fifty dollars per acre of land rather than $100 per acre. Peabody Exhibit 2.

Craig Steinbach, employed by Peabody as a Senior Engineer, testified that mining operations began on top of Black Mesa in the early 1970's. He stated that prior to land use compensation, Peabody had given compensation to residents on top of Black Mesa through right-of way payments for the use of a coal conveyor belt and compensation for loss of personal structures. He did not name any other type of compensation to Black Mesa residents.

The Court notes that the conveyor belt, for which Ms. Leonard received compensation, does not pass through Area 20, based upon testimony and Williams Exhibit 44G. Two maps were introduced into evidence: Williams Exhibits 44G and 47G. Exhibit 44G is an enlarged version of Exhibit 47G, and both are topological maps of Black Mesa with 44G focusing more on the area in dispute. Williams Exhibit 44G, which came from Peabody, also has a number of boundaries and dividing lines indicating the Peabody leased area and Area 20. No party indicated any inaccuracies concerning these designations in Exhibit 44G.

It was through the 1978 land use compensation agreement that compensation payments first went indirectly to two of the parties in this case. Marion Begay, the wife of the late Walter Begay, Sr., is claiming the right to payments previously made to her husband. Walter Begay, Sr. died in 1998, soon after the last Peabody payment was made. Leta Tsosie Williams, the daughter of John Billy Tsosie, is claiming the right to payments previously made to her father. She received the 1993 payment from Peabody herself. Peabody Exhibit 7. Her father had transferred his grazing permit to her prior to this payment. Williams Exhibits 11 and 12. The third party, Fannie Leonard, is claiming a right to payment she had never previously received because she alleges she used the land in Area 20 by which compensation was given to the other parties. Originally, Peabody was a party to this case, but it was dismissed because it agreed to pay whoever was determined to rightfully receive payments under the 1993 compensation agreement between Peabody and the Navajo Nation. This agreement continued payments for loss of land use. Peabody Exhibit 3. Because Peabody is willing to pay according to the decision of this Court, and the Navajo Nation has lodged no objections to this decision, the Navajo Nation is not an indispensable party in this action. This was also determined in the June 16, 2005 Order.

There is no dispute concerning the amount of payment. Payment is for a five-year period from 1998 to 2003. Payment is pursuant to the third agreement entered into by the Navajo Nation and Peabody in 1993. Peabody Exhibit 3. This agreement is still in effect. Steinbach testimony. The agreement stated that compensation would be made in five-year periods at a rate of $100.00 per acre, with adjustments to be made to the rate on January 1, 2003, and every ten years thereafter. *Id.* The amount at issue is for the total acreage disturbed in Area 20, a particular sub-area of land within the land area leased by Peabody from the Navajo Nation for the purpose of extracting coal (hereinafter, "Leased Area."). *See* Williams Exhibit 44A and Peabody Exhibit 7, which notes that the payments to Leta Tsosie Williams and Walter Begay, Sr. are for Area 20.

There is no dispute as to the total amount of acreage in Area 20 determined by Peabody to be the total acreage for purposes of compensation. Vera Shurley testified that the Navajo Land Department relied upon the measurements of acreage by Peabody to establish total payments at the set rate. As of this date, Area 20 is still off limits to potential land users. The acreage in Area 20 for

which compensation is given had been determined to be 370.94 acres. Peabody Exhibits 7 and 8. In addition, there are no disputes before the Court concerning past payments made by Peabody or whether these past payments should be redistributed, if necessary, based upon the determination of this Court, to other parties or in other amounts than what were already made for compensation by Peabody for the land disturbance in Area 20. There is also no dispute that Peabody failed to make past payments or the correct amount of past payments pursuant to its agreements with the Navajo Nation.

This Court received this matter more or less by default. According to Section 7 of the 1978 agreement, the Navajo Nation is supposed to determine what people are to receive payments under the compensation agreement. On April 7, 2003, Vera Shurley sent a letter to Peabody requesting that it withhold payments to the recipients in Area 20 (as well as in other areas) because of "boundary disputes." Peabody exhibit 5. In her testimony, Ms. Shurley stated that she did not make this decision herself. She testified that the Director of the Navajo Land Department, Alfred DeHoya, decided to withhold payments at some point after Ms. Shurley received a telephone call from Craig Steinbach notifying her of a dispute. Peabody accommodated the Navajo Land Department by withholding payments.

The Navajo Land Department never held any hearings or made any decisions concerning the boundary disputes in Area 20. The Navajo Land Department never requested any other administrative agency to make a decision concerning Area 20. It never requested a Navajo Nation court or the Office of Hearings and Appeals to make a decision.

The Grazing Committee for District 8 had a hearing after which it recommended Fannie Leonard be included in the compensation agreement. Leonard Exhibit 1. However, a District Grazing Committees has no authority to settle land disputes, at least in Kayenta District. Section 878 of Title 3 of the Navajo Nation Code; In Re: Joe Customary Use Area, 6 Nav. R. 177, 179 (Nav. Sup. Ct. 1990). The role of a District Grazing Committee is to mediate disputes and no evidence was presented that the District 8 Grazing Committee ever attempted mediation in this matter. The other parties in this case were not present at the Grazing Committee meeting, so obviously no mediation went on at that time. This Court gives no deference to the findings of the District 8 Grazing Committee.

The Black Mesa Review Board, in one of its last administrative acts, declared that the Navajo Nation and Peabody Coal should perform a full investigation to determine if Ms. Leonard had a rightful claim for compensation. Leonard Exhibit 2. Soon after this declaration the Black Mesa Review Board stopped functioning, and it is still not in operation today. Jim Storr, Navajo Nation liaison with the Black Mesa Review Board and former Board member, testified that the Review Board lost its quorum in March 2003 and has not operated since then. The Black

Mesa Review Board has not been abolished by law, but it has been made useless by no further appointments. Mr. Storr testified that the Black Mesa Review Board never made a determination as to the claims in Area 20.

Leta Tsosie Williams brought the matter to this Court in order to get Peabody to make the 2003 compensation payment. As explained in its June 16 Order, the Court assumed jurisdiction over the matter because of administrative inaction and a pressing need to resolve the issue, not only for purposes of compensation but also for the future use of Area 20, which presumably will be available for future use, even if, as indicated in testimony, the one spring in the area has been contaminated by the mining operation. Testimony of Yazzie Leonard and Albert Tsosie.

A number of trial sessions were held in order to present all the testimony and evidence from the parties, between the first session on June 3, 2004, and the last session on June 2, 2005. The hearings were necessarily complicated by the fact that the evidence was related to an issue which should have been decided over twenty-five years ago, but was never definitively done.

The first payments to John Billy Tsosie and Walter Begay, Sr. were made in 1980 for disturbance to land in 1979. Peabody Exhibits 15 and 23. Mining in the Leased Area began farther south on Black Mesa and worked its way north. Area 20 is the farthest northwest section in the Leased Area. Plaintiff Exhibit 44G. There was no indication from the evidence presented that there was any disturbance to land in Area 20 prior to 1979. Vera Shurley, keeper of the records concerning land use payments in the Title Section of the Navajo Land Department, testified that the payments began to Mr. Tsosie and Mr. Begay, Sr. in 1980 because that was when their land was disturbed.

In 1981, John Billy Tsosie and Walter Begay, Sr. signed an agreement that each would take a 1/2 share of the 1980 payment for land disturbed in 1979. Peabody Exhibit 23. Future payments would be divided so that 3/4 of the payment went to Mr. Tsosie and 1/4 went to Mr. Begay. *Id.* Apparently the Navajo Nation and Peabody went along with this arrangement, because payments were subsequently made according to this formula. However, no language within the 1978 agreement between the Navajo Nation and Peabody agreements authorized recognition of such agreements. Section 7 stated that it was the Navajo Nation who was to determine the identity of those to be compensated as well as respective shares of the compensation. Peabody Exhibit 2. While Section 7 stated that this determination by the Navajo Nation could be completed by "either agreement with the residents or through the Black Mesa Review Board," it does not authorize separate determinations made by agreements between or among residents without the authority of the Navajo Nation. *Id.* No such authority appeared on these documents.

There is no direct evidence that the Navajo Nation authorized the agreement between Mr. Tsosie and Mr. Begay. Other than the fact that all payments were

made in conformity with the contract between Mr. Tsosie and Mr. Begay, there is no evidence that the Navajo Nation made any determination that this arrangement was appropriate. It should be noted that Charles Morrison, representative of the Navajo Nation, who signed approval of the payments, also signed his name to maps indicating Area 20 that were signed and dated by the two men. Peabody Exhibits 22 and 23. Vera Shurley testified that Mr. Morrison worked in the Navajo Land Department in the early 1980's. While there is no evidence of a separate determination by the Navajo Nation, the signatures by Mr. Morrison indicate that the Navajo Nation was aware of their agreement and had no objection to it. However, because there was no separate determination by the Navajo Nation, the Court gives no deference to this apparent acquiescence by the Navajo Nation.

The records from Peabody show that yearly compensation payments were made to Mr. Tsosie and Mr. Begay, Sr. from 1980 through 1985 in the proportions agreed upon by the two men. Peabody exhibits 9-15 and 18-23. The records show that no further payments were made until 1993. In 1993, there was to be a one-time payment of fifty dollars ($50.00) per acre to those who had disturbed land prior to 1988. Section 3, Peabody Exhibit 3. The records provided by Peabody show that Mr. Begay, Sr. and Mr. Tsosie were given payments pursuant to Section 3 in 1993. Peabody Exhibits 8 and 17. Extension payments were given in 1998 to Mr. Tsosie and Mr. Begay, Sr. at the rate of one hundred dollars ($100.00) per acre in accordance with Section 3(c) of the contract. Peabody Exhibits 7 and 16. Section 3(c) also specifies that payments will continue on a five-year basis until the land is returned to the users. Peabody Exhibit 3. Rates for payments in 2003 and in the future are subject to negotiation between Peabody and the Navajo Nation. Section 2, Peabody Exhibit 3.

The parties to this case are all relatives who could not agree among themselves how to divide the compensation payments. Fannie Leonard, the daughter of Preacher Peaches and Manymules' Granddaughter, was born in 1914 and raised within the area under dispute. Uncontested testimony was presented that her parents established "Red Clay Hogan," in the middle of Area 20, near a landmark called *chííh 'hagéédii* ("the place to gather red clay powder"), and that is where she and her siblings grew up.

Marion Begay is the wife of Walter Begay, Sr., the son of an older sister to Fannie Leonard. Walter Begay, Sr. was born around 1918. The mother of Leta Tsosie Williams, Gladys Tsosie is the younger sister to Walter Begay, Sr. She was born around 1925 (Fannie Leonard testified Gladys was about seven years old when she came to live with her in 1932) and married John Billy Tsosie in 1944. Testimony was presented that Fannie Leonard took over the care of Walter Begay, Sr. and Gladys Tsosie after their mother died sometime around 1932. Credible evidence was presented that as young women, Fannie Leonard, Gladys Tsosie and Susie Foot, a younger sister to Fannie Leonard, herded their respective livestock together in the area until time, husbands and separate families sent them apart.

Marion Begay testified that she lived on top of Black Mesa in the 1950's after she married Walter Begay, Sr. and herded sheep, both separately and together with the other women. All testimony agreed that at least some of the grazing by all four individuals was done in Area 20 in the 1950's.

Unchallenged testimony was presented that Fannie Leonard married Jack Leonard in 1941 or 1942. Gladys Tsosie married John Billie Tsosie not too much later. Leta Tsosie Williams testified that her parents were married in 1944. Priscilla Yazzie, the second oldest child of this marriage, testified she was born in 1950.

Ned Yazzie testified that soon after John Billy Tsosie came to live on Black Mesa, he built a family house in which the Tsosie family lived until it was destroyed by the mining activities. Susie Foot testified that she left the top of Black Mesa around the late 1950's or early 1960's (Yazzie Leonard testified that the date was 1960) and lived only below Black Mesa from that time forward. Certainly by 1960 the four women were no longer herding their livestock in one herd. In 1962 Range Management Units were established below Black Mesa in Longhouse Valley for Jack and Fannie Leonard, Walter and Marion Begay, Sr. and Susie Foot. Testimony of Gary Gilmore.

The center for this herding activity in the 1950's was a spring, alternately called by witnesses as "Bitter Spring" or "Salty Spring." The Court notes that the more accurate translation of the Navajo term used by all witnesses identifying this spring would be "Salty Spring" (*Tó dík'ǫ́ǫ́zh*) and it will refer to it by this name. There was testimony also concerning use of another spring called "Bitter Spring," but that spring was indicated as being outside of Area 20 and its use has no bearing in determining the use of land in Area 20. All the witnesses agree that Salty Spring was located at or near the designation of the word "Spring" on the map of Williams Exhibit 44A, located in or near Area 20, in the northeast corner of Area 20.

Williams Exhibit 44G indicates that Salty Spring is within the Leased Area. However, there was testimony by Yazzie Leonard, daughter to Fannie Leonard, that it is just outside the boundary of the Leased Area. Fannie Leonard testified that she had a cornfield just south of Salty Spring where she planted continuously for many years, including the previous year of 2004. Based upon other evidence presented that land users are not permitted within the Leased Area where the lands have not been returned to the users and testimony that no land in Area 20 has been so released, Fannie Leonard would not be permitted to do this if Salty Spring were within Area 20. If it is within the leased area, it is within an area not ever and not currently disturbed by the mining operation.

There is also a question of the exact boundaries of Area 20. The southern, western and northern boundaries are clearly defined on Williams Exhibit 44A, but there is no eastern demarcation. Salty Spring may or may not be considered to be within Area 20. This is understandable to the court, because testimony

was presented that other families who did not use the land in Area 20 used this spring to water livestock when necessary. This includes the families of Ned Yazzie and Dr. Tommy Yazzie, who both testified that at times their families used that spring, although they did not graze in Area 20. This is in accord with traditional Navajo custom that while certain areas may be designated for exclusive use by an individual or a family, a source of water would be available for all, no matter whose exclusive area for grazing the source water was situated within. The Court concludes that because of the "easement" around the spring established by traditional Navajo custom exercised by land users from many areas within the Leased Area, an exact eastern boundary for Area 20 would not be practicable.

The Court finds that an exact location for the eastern boundary is not necessary to determine who is rightfully compensated for Area 20. The grazing of livestock covers a wide area, so that an exact boundary is not necessary. Other than the three parties to this case, no one else has stepped forward to say he or she grazed in the contested area. There was sufficient testimony from neighbors past and present to conclude that only these three parties before the Court can be considered to reasonably assert a claim to the use of Area 20.

This Court determined that first it must determine who was using the land in Area 20, either through customary use or through a grazing permit, at the time the land was disturbed, since there was no record of such a determination by the Navajo Nation in the past. The Court asked the parties to focus on this issue of who was using the land at the time the disturbances began because the first trial sessions, beginning in June 2004, made it abundantly clear that some sort of limitation had to be placed on the presentation of evidence to avoid confusion or endless complication of very old facts.

The Court holds that only the parties actually suffering a loss by a disturbance of land within Area 20 should be compensated. The loss would be to those parties whose use of the land in Area 20 was interrupted by the mining activity. When the Court made the decision to limit evidence to use of the land near in time to the original compensation payments, it also determined that if the Court were to find that compensation should be paid to more than one party, further hearings could determine the proper share to each, if the parties themselves could not agree, as well as any other outstanding issues that may need argument or testimony in order to reach a final decision.

The Court finds that since compensation for Area 20 was first paid out for disturbance to the land in 1979, the parties who were using that land, either by grazing permit or by customary use in 1979 or immediately prior to 1979, are the proper parties eligible for compensation under the 1974, 1978 and 1993 agreements for compensation between the Navajo Nation and Peabody. By "immediately prior" the court means a reasonable period of time before which a person would not be considered to be using the land if that person had stopped using the land sometime before 1979.

The date of 1979 as the beginning of land disturbance in Area 20 is based upon deduction from the facts presented. No payments were made to users of Area 20 under the 1974 agreement, and the first indication of disturbance in the records is compensation for disturbance in 1979. This coincides with the first compensation payment. As noted above, Vera Shurley testified that the payments in 1980 closely coincided with the initial disturbance of the land. There were no protests lodged with Peabody or the Navajo Nation that compensation for Area 20 should have started earlier. While there was much testimony indicating that Peabody was active on Black Mesa well before 1979, there was no testimony that contradicted the payment records of Peabody that the land in Area 20 was not disturbed until 1979.

Based upon the above findings and conclusions, upon all the evidence and testimony presented at trial, and upon the other arguments presented in previous motions by the parties in this matter, including the written closing arguments submitted by all the parties after the final session of June 2, 2005, the Court ORDERS that compensation for land disturbance be paid as follows: to Marion Begay, NO COMPENSATION; to Fannie Leonard, COMPENSATION for one acre for a lost cornfield, which may be adjusted upon further proof as indicated below, but NO COMPENSATION for loss of grazing land; to Leta Tsosie Williams, COMPENSATION for loss of grazing for all remaining compensation after payment to Fannie Leonard for the loss of a cornfield. The Court bases this determination upon the following findings of fact and conclusions of law, as well as the findings of fact and conclusions of law set out in the above Introduction.

## MARION BEGAY

1. Fannie Leonard testified that Walter Begay, Sr. came to live with her after his mother, her sister, died when he was about fourteen years of age. This was approximately in 1932. She also testified that Walter Begay, Sr. had his own livestock from his mother.

2. Marion Begay testified that she married Walter Begay, Sr. when she was seventeen years old. This would have put the marriage in the late 1940's. She also testified that she lived with her husband on Black Mesa for a number of years right after they were married. This conforms to the testimony of Dr. Tommy Yazzie, who stated he saw Marion Begay herding sheep in Area 20 when he was very young, approximately in the years 1954-1958.

3. Marion Begay testified Walter Begay, Sr. purchased 20 sheep units from Rosita Claw in addition to the sheep he had gotten from his mother. She also was given about forty sheep units from her sister.

4. Walter Begay, Sr. received a range management unit in or around 1962. Testimony of Gary Gilmore, Fannie Leonard and Susie Foot. By this time he and Marion had moved their livestock off the top of Black Mesa, or else they moved it off when they gained a range management unit. After the period

of living on top of Black Mesa in the 1950's, Walter and Marion established a home in Longhouse Valley, below the mesa, and lived there permanently.

5. Leta Tsosie Williams, born in 1957, and herding her parents sheep since she was little girl, stated that except for the temporary period in the 1970's, Walter Begay, Sr. never herded her sheep on top of Black Mesa during her lifetime. No one contradicted this testimony.

6. Walter and Marion did not graze livestock on top of Black Mesa except for a period of time in the mid to late seventies after they moved off in the late 1950's or early 1960's and grazed sheep within their range management unit. Most witnesses agreed to this, and the only limited disagreement was to how long the Begay, Sr.'s grazed on top of Black Mesa in the 1970's. Marion Begay stated that they herded sheep up there for six years. The Court does not find that this recollection of the time period credible because a large number of witnesses all stated the Begay Sr.'s were on the mesa for one or two years. Marion Begay also testified that she did not have a very good memory, and demonstrated the truth of this statement a number of times by failing to recollect many dates and times, including the ages of her children.

7. The following is what other witnesses testified as to the length and nature of the stay of the Begay Sr.'s on top of Black Mesa during the time period relevant to this case:

Leta Tsosie Williams testified that the Begay, Sr.'s were on top of Black Mesa for two years around 1979 and 1980, camping out for two seasons in a summer shade house.

Stanley Tsosie, born in 1959, testified that he never saw the Begay Sr.'s herding sheep on top of Black Mesa in his lifetime, except for a couple of years in the late 1970's, when they lived in a tent.

Albert Hoskie stated that he recalled the Begay Sr.'s living on top of Black Mesa for about one year, where they lived in a small shack (*chaha'oh*). Fannie Leonard testified that Marion Begay herded sheep for about three months on top of Black Mesa about ten years ago.

Yazzie Leonard testified that Marion Begay grazed sheep for about one year around 1980 on top of Black Mesa while living in a temporary house.

Albert Tsosie testified that the Begay Sr.'s lived on Black Mesa for two summers around 1975 or 1976.

8. The Court takes judicial notice of the traditional agricultural practice of living in a tent or *chaha'oh* (shadehouse) as a temporary means for grazing in times of poor forage or shortage of water. Once this temporary living condition disappeared, one would return to the permanent seasonal home.

9. Marion Begay testified to two different structures in which they lived: a tent and a structure with upright wooden poles. The Court notes that the latter structure as described by Ms. Begay conforms with the recollection of those who said they lived in a *chaha'oh*.

10. The evidence clearly established that the Begay Sr.'s did not hold any independent claim to the land on top of Black Mesa because they had to ask permission to graze up there. Marion Begay stated that they had asked the permission of Gladys Tsosie to herd their sheep for that period of time they were on top of Black Mesa in the 1970's, as well as one other person. That permission was granted by Gladys Tsosie was confirmed in the testimonies of Let a Tsosie Williams and Stanley Williams.

11. The fact that the Begay Sr.' s were only temporary users of the land on top of Black Mesa and that they had to ask permission to use the land when they did use it indicates they did not have an independent claim to the land either through a grazing permit or through customary use. There is no question that Walter Begay, Sr. and through him Marion Begay would have had a valid clam to the use of Area 20 at some point in a previous time. Walter was born in that area, inherited sheep from his mother prior to the usage of grazing permits and there is evidence that his sheep were grazed continuously in that area until the couple moved off Black Mesa and used their grazing permit for a range management unit in Longhouse Valley beginning in the early 1960's.

12. There is a policy articulated by the Navajo Nation Supreme Court that Navajo Nation lands are to be used wisely and well, and that whose who actually live on them and nurture them should have rights to their use. *Begay v. Keedah*, 6 Nav. R. 416, 421 (Nav. Sup. Ct. 1991). Generally, grazing permits are based upon traditional customary use areas maintained by families from before the time grazing permits were issued. *See Yazzie v. Catron*, 7 Nav. R. 19, 21-22 (Nav. Sup Ct. 1992). Of course this generality has altered over the years as grazing permits are transferred and sold. However, the facts of this case show how families who grazed livestock in an area long before grazing permits were issued continued to graze in the same manner after receiving grazing permits that acknowledged (as well as limited) the livestock they maintained.

13. Gary Gilmore, employed by Natural Resource under the United States Department of Agriculture since 1986, testified that grazing permits do not have definite boundaries delineated on the permit. This distinguishes them from range management units, where a grazing permit of a certain number of livestock are kept within very strict boundaries, rather than being allowed to roam freely in a much larger area, as livestock under grazing permits are allowed to do. Mr. Gilmore also testified that the use of range management units were introduced as a means for greater control over the use of grazing land in order to better preserve it.

14. A grazing permit is a more formalized version of customary usage. Gary Gilmore defined customary use areas as open range areas, not fenced in, that were established when grazing permits were first issued to those

856

families occupying those areas at the time. He also testified that customary use areas when not fenced in could be modified as a result of how neighbors use the common range area. Betty Dodson, District 2 Grazing Official for thirteen years, testified that the difference between open range and a range management unit is that grazing permits cannot move from place to place when they are set within a range management unit. The Court finds that because there are no fences on open land, a grazing permit holder can change the area in which he or she grazes livestock while still maintaining the number of animals allowed under the permit. The only limitation on movement is the neighboring permittees.

15. There is no ownership of land on the Navajo Nation as exists in the States. *In Re Estate of Wauneka*, 5 Nav. R. 79, 81 (Nav. Sup. Ct. 1986). The concepts and rights associated with "fee land" in American jurisprudence do not always apply when sorting out analogous property rights to Navajo land. Navajo courts do recognize a possessory interest that is often tied to customary usage. *Dennison v. Tucson Gas and Electric*, 1 Nav. R. 95 (Nav. Ct. App. 1974) (Traditional use area connected to grazing permit compensable as a taking under the Navajo Nation Bill of Rights). Certain aspects of fee ownership also attach to this possessory interest and grazing permits can be willed, inherited or transferred through gift or sale. The maintenance of grazing permits by the BIA allows a formal method to record such transfers, even if their original intent may have been only to limit the numbers of livestock in order to preserve grazing land.

However, grazing permits do not indicate precisely where the land transferred begins and ends. Range management units may do this, but grazing permits do not. This is different from the American fee system, which very precisely records the limitations of the area of land in which a person has rights, so that when the land is transferred, the spatial limits of that transfer are precisely known.

16. Another aspect of the Navajo land system that differs from the land system of the States is the "use it or lose it" aspect of possession in Navajo property rights. *Begay v. Keedah*, 6 Nav. R. 416, 419-420 (Nav. Sup. Ct. 1991). Under the American fee system, once a person "owns" property, that person has total rights to use it or not use it, as he or she fits, assuming of course there is no other violation of tax, zoning or other government restrictions legally placed upon the property. While the "use it or lose it" requirement would not apply as rigorously to range management units, it certainly applies to possessory interests that are utilized through grazing permits or customary usage. It operates like the legal concept of adverse possession, except that adverse possession rules are very strict and are protective of the named owner's possessory rights. *See* generally *Adverse Possession*, 3 Am. Jur. 2d Section 170 *et seq*. However, there is no such prescriptive right against the Navajo Nation, the ultimate owner of all Navajo land. *Yazzie v. Jumbo*, 5 Nav.

R. 75, 77 (Nav. Sup Ct. 1986), recently reaffirmed in *Navajo Nation v. Arviso*, 8 Nav. R. 697, 704 (Nav. Sup. Ct. 2005).

Such a lack of prescriptive right also pertains to claims to customary use areas that are no longer used by the holders of that customary right. This makes the Navajo possessory interest in customary use areas different from the holders of land in fee simple. Customary use in the grazing of livestock, either through traditional use or through grazing permits, is normally done on land that overlaps with other family members or neighbors who are doing the same thing. Boundaries are usually agreed upon on an informal basis, without recourse to written documents, and the boundaries can change over time, due to changes in family and neighbors who use the land.

Such a system does not permit recourse to a fee system, where an owner can hold exclusive use against all other users simply because the owner has his or her name on a piece of paper. The holder of a grazing permit must regularly assert the possessory interest by taking advantage of that right through actual use and possession. If it is not exercised, someone else can take over the right to use the same land by putting it to good use. The Navajo Supreme Court summed this up in the following:

Livestock grazing is not allowed on Navajo trust land without a valid grazing permit. 3 N. T. C. Section 781. Such a permit allows its holder to own livestock and to graze that livestock on Navajo trust lands to which he or she has use rights. No one can hold a grazing permit unless he also holds use rights to land sufficient to support the livestock authorized. A grazing permit alone does not give its owner the right to use land. A permit holder must also have use rights to a particular piece of land in order to keep and exercise his or her permit. *Yazzie v. Catron*, 7 Nav. R. 19, 21 (Nav. Sup. Ct. 1992). This conforms to the Navajo Nation policy that all its land is to be utilized for the beneficial use of the Navajo people. For this reason the Navajo Supreme Court developed the concept of a customary trust, to insure that agricultural land did not become subdivided too far through inheritance to no longer be practicable. *In the Matter of the Estate of Wauneka*, 5 Nav. R. 79 (Nav. Sup. Ct. 1986).

17. Consequently, although Walter Begay, Sr., and through him, Marion Begay, at one time in their lives could very well have asserted a possessory right to land in Area 20 because of the fact that Walter herded his own sheep in an area which was used from long before he was born by his direct ancestors, this right was lost when he stopped using the land in the late 1950's or early 1960's and other families with their grazing permits and traditional use of the land took over that area. The fact that they returned for one or two years in the 1970's and grazed sheep while living in temporary shelters does not retrieve this lost right, especially in light of the fact that Mr. Begay, Sr. had to ask permission to use the land and never used it at this time under his own claim of right. The Court finds that he and Marion Begay

suffered no loss by the disturbance of land in Area 20, and that Marion Begay has no future independent possessory interest in Area 20.

## LETA TSOSIE WILLIAMS

1. The evidence shows that Leta Tsosie Williams possesses a grazing permit that she received from her father. Williams Exhibits 11 and 12. Ms. Williams' parents were John Billy Tsosie and Gladys Tsosie.

2. Fannie Leonard testified that she took over maternal duties for Gladys Tsosie around 1932, when Gladys was about seven years old, because her older sister, Gladys' mother, died. Fannie Leonard also testified that Gladys Tsosie had her own sheep, inherited from her mother, which were grazed together with Fannie Leonard's and Walter Begay, Sr.'s sheep.

3. Albert Hoskie, oldest son of Fannie Leonard, born in 1935, testified that Gladys Tsosie lived in his mother's hogan when he was a boy. The hogan was located near Salty Spring. He testified that Gladys continued to live there until she married John Billy Tsosie. He testified that Gladys had her own sheep.

4. Fannie Leonard, as well as others testified that Gladys Tsosie continued to graze her sheep with Fannie Leonard and Susie Foot in an area that included Area 20 into the 1950's. At some point in time after Gladys married John Billy Tsosie, they took their livestock and grazed them separately, building a house a short distance west of Salty Spring, which remained the family home until it had to be abandoned in 1979 or 1980 due to the coal mining operation. Ned Yazzie testified that John Billy Tsosie moved up on Black Mesa around 1950, and that John Billy Tsosie built a home in which the family lived until they were forced to move because of the mining operation.

5. Leta Tsosie Williams testified that her parents were married in 1944. This is a likely date, because Priscilla Yazzie, the second oldest child of the family, testified she was born in 1950. Ms. Williams was born in 1957, and she was the fourth oldest child. Albert Tsosie, the third oldest child, testified that he was born in 1952. Fannie Leonard testified that Gladys got married around the same time she married Jack Leonard, which she testified was in 1941 or 1942.

6. Evidence was presented that Gladys' livestock was increased by some animals John Billy Tsosie brought with him from his home area. In addition, transfers in the late 1950's and early 1960's to Mr. Tsosie increased their livestock. Williams Exhibits 7, 8 and 9.

7. Testimony at trial provided convincing evidence that the Tsosies and through them, Leta Tsosie Williams, used the land in Area 20 to graze their livestock continuously from the time John Billie and Gladys were married until they were prevented from doing so by the incursion of the Peabody coal mining operation. Only one witness stated they did not use Area 20, but

only used land directly to the west and north which did not include Area 20: Yazzie Leonard. The Court does not find her testimony credible, because she stated that she spent very little time on Black Mesa after she graduated from high school in 1968 through 1980, and because her testimony is directly contradicted by others, particularly by Ned Yazzie, who has no interest in the outcome of this case, and by Marion Begay, who stated that she and her husband asked permission of the Tsosies to use their grazing area before they used it in the 1970's. Marion Begay stated that during that period of time that although they lived outside of Area 20, they went into Area 20 for grazing. Marion Begay testified that the only other person using that area then was Leta Tsosie Williams. Williams Exhibits 13 and 25, which Vera Shurley testified as belonging together, executed in 1982, signify further contemporaneous recognition by Ned Yazzie that the Tsosies used Area 20 at the time of the mining.

8. Leta Tsosie Williams testified that she continues to graze livestock north and west of Area 20 to this day through the grazing permit she received through her father and mother. Fannie Leonard testified that the customary grazing area in Area 20 was used by the direct ancestors of Gladys Tsosie prior to when Ms. Leonard was born in 1914. Testimony raised questions whether Ms. Williams currently lives in Kayenta or on top of Black Mesa. Where she lives has no bearing on the issue of whether she has a grazing permit and whether she is using that permit in an area near Area 20, and whether she has continuously used that permit. No testimony contradicted any of these facts.

9. Leta Tsosie Williams testified that she was born in the family home, about a mile due west of Salty Spring, that she had always lived there until the family moved because of the mining, that she helped herd her parents' livestock since she was a little girl, and that she continued to herd sheep until the present day, both before and after the family's grazing permit was transferred to her in 1994. Williams exhibits 10, 11 and 12. No evidence presented contradicted this testimony.

10. The Court finds that Williams has a valid claim to compensation for loss of land use and a possessory right to future use of Area 20 for grazing purposes, if and when it is made available. Her claim is based upon long term traditional use through her mother, whose ancestors used that area for many years, through a grazing permit given to her mother and father that formalized that use, and through continued use of land in Area 20 up to the time that use was interrupted by Peabody.

### FANNIE LEONARD

1. Fannie Leonard testified that she was born in 1914 within Area 20 at Red Clay Hogan, situated near *chííh Hagéédii* (rough translation: "place to gather

the red clay powder"), a landmark within Area 20 that had been destroyed by the Peabody coal mining operation. She testified that at least to the end of the 1950's she lived around Salty Spring and herded sheep in Area 20, and that Gladys Tsosie and Susie Foot, her younger sister, herded their sheep with hers.

2. Yazzie Leonard, Fannie Leonard's daughter, testified that when she was a child in the early 1950's, the family moved from the hogan near Salty Spring to a place a little north of Area 20 but still near Salty Spring. The family also moved one or two other times until they moved to their current residence. Each move would be a little farther north.

3. An issue was raised in the proceedings as to whether Fannie Leonard's grazing permit, which is still used by her family (the grazing permit is currently in her name but she testified that she stopped herding sheep herself about six years ago), is valid. The Court finds that Fannie Leonard does have a valid grazing permit in spite of all the confusion over names and how the permit was passed on over the last sixty-five years.

4. As noted above, grazing permits are based upon traditional use. Our highest court has held that a grazing permit is the functional equivalent of a deed. *In Re Estate of Nelson,* 1 Nav R. 162, 165 (Nav. Ct. App. 1977). Above we noted differences between a Navajo interest in land and how that interest may deviate from the rights inherent in deeds to land in the American system. Another difference is that States have official recording systems and title companies that carefully review recorded interests in land to determine if errors or contradictions make assertions of ownership or transfers invalid because of errors or omissions in the documents. We have no such system on the Navajo Nation. While our grazing permits as maintained by the Bureau of Indian Affairs provide some sort of record, it has never been asserted that these records are the functional equivalent of recording or title systems. It may be necessary for the Navajo government in the future to implement such a system as the population continues to grow and the use of land diverges from traditional practices, but at this time there is no such system.

Our present system, at least outside the use of range management units, is still based upon traditional use of grazing areas with the "use it or lose it" principle that someone else can lay claim to a specific grazing area if the previous users have abandoned or otherwise forsaken it. In other words, our system is still based on looking at the actual land and seeing who is using it, rather than looking at pieces of paper, whose written, recorded language serves as the ultimate determination of who has right to property. That is why grazing committees are so important to our system. They are made up of local individuals who regularly monitor the use of land and who is using it.

5. Fannie Leonard claims that her grazing permit began with a permit

established in 1940 and granted to "Rose Peaches (Estate)." Leonard Exhibit 4a. No one who testified could say with any certainty who Rose Peaches was. Ms. Leonard denies that she has ever been known as Rose Peaches. It appears one of her sisters was named Rose Peaches, but there is not universal or conclusive agreement as to which one. Every one agrees it was not the mother of Gladys Tsosie and Walter Begay, Sr. Fannie Leonard also said Rose Peaches was not the mother of Grandma Littlesalt, an older sister of Fannie Leonard, and no one else contradicted this. Fannie Leonard stated that Rose Peaches had no children. She testified that she and Rose would take the sheep to sheep dippings, and after Rose died, she got the sheep.

6. Another grazing permit with the same number and issued on the same day stated that it belonged to "Peaches' Daughter (Jack Lynn)." Leonard Exhibit 7b. This permit also designated a brand, which Yazzie Leonard testified that the family still uses on its livestock. Fannie Leonard testified that she was known as Peaches' Daughter, but testimony from other witnesses revealed that all the daughters of Preacher Peaches were known as Peaches' Daughter. The grazing permit in Leonard Exhibit 7a has the census number of Fannie Leonard. The grazing permit of 7b has the permit number of Jack Leonard. A third permit, also issued with the same date as the other two, was issued to Jack Lynn, with Jack Leonard's census number. Leonard Exhibit 4e.

7. A document indicating a change in the grazing permit, with the same brand, was issued in 1959 to "(Fannie Lynn) Peaches' Daughter." Leonard Exhibit 4L. The original document stated Jack Leonard's census number, which was crossed over and Fannie Leonard's census number was hand written above it. Over time other related documents (sheep counts, dipping records, transfers) would show equal inconsistency and lack of explanation as to the name changes. However, through all the documents the census numbers would remain the same: the two census numbers for Jack Leonard and Fannie Leonard. In addition, the brand designation, when it appeared, was also always consistent.

8. Fannie Leonard testified that she did not know who Jack Lynn was. She stated that her husband's name was Jack Leonard. Most other witnesses also agreed that her husband was named Jack Leonard. However, Ned Yazzie testified that he knew Jack Lynn because Jack Lynn was his uncle. He stated that Jack Lynn was married to Fannie Leonard. The Court finds his testimony to be credible.

9. If it is true that consistency is the hobgoblin of little minds, then it must be concluded that the record keepers at the BIA have very large minds. However, as noted above, it is not the paper record that controls in customary land disputes. The Court also takes judicial notice that Fannie Leonard came from a generation where American names and the consistent use of such names were not common. Many individuals had personal Navajo names

which were not spoken, yet these were the names by which individuals knew themselves. There was testimony that Ms. Leonard was called Fannie because that is what another relative suggested when census numbers were being established.

10. What is undisputed is that Fannie Leonard has been herding sheep almost all of her life on top of Black Mesa, and for about sixty-five years she has been doing it under a grazing permit. It may be that the grazing permit originally came to her through an inheritance through Rose Peaches. Even today legal probate actions are the exception rather than the rule among the Navajo. That would so much more the case in 1940, long before modern Navajo courts were established. However, no one had ever challenged the transfer of a grazing right from Rose Peaches to Fannie Leonard, and the time for such a challenge has long passed away. Ms. Leonard's use of a grazing permit and her herding livestock on top of Black Mesa has not been challenged for sixty five years by anyone before this case, although many relatives, including siblings, and various branches of the family lived with her or in close proximity to her. The BIA has regularly and consistently acknowledged that a herd of sheep and other livestock belonging to Jack and Fannie Leonard has grazed in the area of Black Mesa since 1940. No official ever asked her or her husband to remove her herd or tell them the animals really belonged to someone else. While the consistency of the paperwork is certainly open to challenge, no one has indicated that the sheep Ms. Leonard has kept most of her life really belong to someone else. The Court finds that the grazing permit held by Fannie Leonard is a valid grazing permit, the permit belongs to her, and she holds all property rights available to that grazing permit under Navajo law.

11. An issue was also raised that Fannie Leonard was absent from Black Mesa for very long periods, living near Farmington, New Mexico. Some witnesses said she was absent through most of the 1970's, some said she was only gone for short periods of time, with one or more of her children watching her livestock in her absence. There was no conclusive evidence presented one way or another. As with Leta Tsosie Williams, the proper question for the court is not where Fannie Leonard lived, but whether she continued to utilize her grazing permit by maintaining livestock on top of Black Mesa. No one testified that she did not. The Court heard testimony from two grazing officials, Philip Singer and Barbara Greyeyes, and neither testified that Fannie Leonard ever stopped herding livestock around her residence.

12. The question whether Fannie Leonard's grazing permit allows her to collect compensation for loss of land use in Area 20 is another matter. The same standards apply to her as they do to Marion Begay and Leta Tsosie Williams: did she still use the area or have a valid claim to use of the area at the time of the destruction of Area 20 in order to receive compensation for a loss? The great majority of the evidence indicates she no longer had grazing

rights in that area because she had moved her residence farther north sometime in the early 1960's and no longer used Area 20 from that period on.

Albert Hoskie testified that his mother moved to her current residence in 1960.

Susie Foot testified that Fannie Leonard moved to her present location about forty years ago.

Priscilla Yazzie, who stated that she was born in 1950, testified that Fannie Leonard moved to her current residence when she was nine or ten years old.

Yazzie Leonard testified that her family moved to their present location approximately when she was seventeen years old, which would have made it about 1965.

13. Yazzie Leonard testified that her mother's current residence is approximately seven miles north of the northern boundary of Area 20. Priscilla Yazzie also testified that this was the distance. Yazzie Leonard also testified that her mother's sheep would graze up to six to seven miles south of their residence.

14. Priscilla Yazzie testified that Fannie Leonard's grazing area, after she moved to her current residence, did not include Area 20. She stated that she attended family meetings in 1973 and 1975 concerning an attempt by her father, John Billie Tsosie to erect a fence on the northern end of his grazing area, which would also be the southern end of Fannie Leonard's grazing area. She testified that Mr. Tsosie was not able to get the permission of Fannie Leonard to erect a fence because there was an overlap of grazing area between their two areas. She also testified that the farthest south of Fannie Leonard's overlap was still to the north of Area 20.

15. Marion Begay testified that when she and her husband asked permission from the Tsosies to graze upon their land in the 1970's they did not ask permission from Fannie Leonard. She stated that only Leta Tsosie Williams was grazing in that area, and that Fannie Leonard was not. Evidence from various witnesses placed the temporary camp of the Begays during that period in an area a little bit north of Area 20. If Fannie Leonard was not grazing sheep in this area, the court cannot accept the assertion that she was grazing even farther south.

16. Yazzie Leonard testified that after her mother moved to her current residence, they continued to use Salty Spring to water their sheep. As noted above, many families who did not claim grazing rights in Area 20 used this spring. Ned Yazzie and Dr. Tommy Yazzie testified that their families used Salty Spring on occasion, although their families, who have also been on Black Mesa for a long time, do not claim customary use of Area 20. Use of the spring alone is not indicative of grazing rights in Area 20.

17. Priscilla Yazzie testified that Fannie Leonard would sometimes use Salty

Spring, but her herd would not graze in Area 20.

18. Stanley Tsosoie testified that when his family was trying to relocate in 1977 and 1978, Fannie Leonard grazed her sheep to the north, outside of Area 20.

19. Leta Tsosie Williams testified that at the time Area 20 was consumed by the mining operation, the Tsosie grazing area was between Fannie Leonard to the north and Ned Yazzie to the south. She also testified that this was the situation since she was a child in the early 1960's.

20. Fannie Leonard testified that she maintained two cornfields south of Salty Spring. The more northern cornfield is still in use, and she planted there as late as the summer of 2004. Yazzie Leonard testified that the cornfield that was further to the south was destroyed by the Peabody mining operation. Susie Foot testified she shared both cornfields with Fannie Leonard until she moved off Black Mesa (about 1960). Albert Hoskie testified that his family planted corn south of Salty Spring. Based upon their testimony the Court finds that Fannie Leonard maintained a small portion of Area 20 for a cornfield which was interrupted by the mining operation. The Navajo Supreme Court has previously noted that in addition to grazing, Navajos use customary use areas for small agricultural plots. *Yazzie v. Catron*, 7 Nav. R. 19, 21 (Nav. Sup. Ct. 1992).

21. The Court holds that the maintenance of a cornfield does not by itself preserve Fannie Leonard's grazing rights in Area 20. As noted in the discussion above concerning the principle of "use it or lose it" which is tied to Navajo land use, individuals do not hold symbolic claims for land use. There are no prescriptive rights in land. *Yazzie v. Jumbo*, 5 Nav. R. 75, 77 (Nav. Sup. Ct. 1986). A person continues to use a certain area and that use is the basis for a person's claim. If a person moves to another area, the person cannot maintain a claim to another area simply on the basis that he or she once used that area. Maintaining a cornfield in an area that is tolerated by others using the area for grazing does not mean that one maintains the same rights to grazing over another individual who took over grazing in that area.

22. In closing argument, Fannie Leonard asserted that she had a superior claim to Area 20 because her use of it predated that of Gladys Tsosie. This is a common assertion in European law, especially made by the invading countries who came to the Americas (at least for claims with each other, even if they ignored the prior claims of native Americans). However, as noted above, what counts is who continues to use the land, not who uses the land first. As noted above, an overriding policy for the Navajo Nation is to insure that its land is put to beneficial use. For such reason the customary trust was developed. *In the Matter of the Estate of Wauneka*, 5 Nav. R. 79, 91 (Nav. Sup. Ct. 1986). This beneficial use of land would be undermined in a similar way to the potential fragmentation through inheritance as contemplated in

*Wauneka* if parties could continue to claim superior rights to grazing lands they no longer used.

23. In opening argument Fannie Leonard's counsel maintained that she was used by the other parties who took advantage of her ignorance due to her inability to read and write English in order to cheat her out of her share to compensation in Area 20. The Court heard no evidence supporting this claim. Yazzie Leonard testified that she asked her mother years later why she did not pursue a claim back when compensation was being determined for compensation in Area 20. She stated that Fannie Leonard told her that she was waiting for the other parties to approach her. The Court does not find either the claims of ignorance or passivity credible. It notes that Fannie Leonard received compensation for the construction of a conveyor belt in 1972. Leonard Exhibit 7a. She also received compensation for an abandoned hogan and corral situated Area 20 in 1980, the same year that payments were first made for compensation of loss of land use in Area 20. Leonard Exhibit 7d. The documents show that not only did she receive compensation for the hogan and corral, but she actively negotiated her own demand for payment, after an initial determination that the buildings were without value. Leonard Exhibits 7b, 7c and 7d. A document that Fannie Leonard witnessed in 1980 purported to be some sort of agreement among John Billy Tsosie, Marion Begay, Walter Begay, Sr. and Ned Yazzie, which focused in on the use of the land within Area 20. Williams Exhibit 21. Although the agreement itself is so ambiguously written the Court cannot put a reasonable interpretation on its meaning, nevertheless, the fact that Ms. Leonard was made a witness to this document indicates she was not excluded or exploited for her "ignorance." It also shows that about the same time she was signing a document to collect compensation for abandoned structures in Area 20 (January 31, 1980), she was witnessing some sort of understanding concerning the use of Area 20 while not making a claim of her own (June 18, 1980). The proper time for Ms. Leonard to make a claim would have been at that time.

24. Consequently the Court finds that due to her move to a grazing area farther north, Fannie Leonard did not suffer a loss by the destruction of grazing land in Area 20 because her customary use area moved to a location outside Area 20. However, because she maintained a cornfield in Area 20 up to the time of its destruction, she should be compensated for its loss. The Court awards one acre of compensation for the loss of the cornfield, and holds that Fannie Leonard maintains the right to continue to use a cornfield in that location if and when Area 20 is reopened for use. The Court holds that she does not hold future grazing rights in Area 20.

The Court notes that it is only estimating the size of the cornfield because no evidence was presented at trial concerning its size. The Court will allow Fannie Leonard, if she so chooses, to present evidence if she believes she should

get compensation for more than one acre for the southern cornfield near Salty Spring.

THEREFORE, THE COURT ORDERS THAT COMPENSATION FOR LOSS OF LAND USE IN AREA 20 OF THE PEABODY LEASED BOUNDARY AREA IS AWARDED SOLELY TO LETA TSOSIE WILLIAMS, EXCEPT FOR COMPENSATION OF ONE ACRE OF LAND TO FANNIE LEONARD, SUBJECT TO PROOF THAT THE LOST CORNFIELD WAS GREATER THAN ONE ACRE.

This Interim Judgment is not a final judgment for purposes of appeal. A Status Hearing is scheduled for Tuesday, October 4, 2005, in Kayenta District Court at 9:30 a.m. At that time the parties shall inform the Court of any further legal argument or additional testimony they may wish to present concerning matters not covered in this Interim Judgment.